In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1603

Prem Lalvani,

Plaintiff-Appellant,

v.

Cook County, Illinois, and Robert Coleman,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 2847--Ronald Guzman, Judge.

Argued December 4, 2000--Decided October 15, 2001


   Before Flaum, Chief Judge, and Diane P.
Wood and Williams, Circuit Judges.

   Diane P. Wood, Circuit Judge.  Prem
Lalvani worked as a social worker for
Cook County Hospital (CCH) from 1966
until 1996, when he lost his job as part
of an overall reduction in force, or RIF.
Believing he had been unfairly selected
for termination, he fought back with a
lawsuit against Cook County and the
Director of the Social Work Department at
CCH, Robert Coleman, charging unlawful
discrimination, retaliation, and a
variety of other federal and state
claims. The district court granted
summary judgment for the defendants on
all of the federal claims and declined to
retain jurisdiction over the remaining
state law claims. Lalvani has appealed
only the dismissal of his discrimination
claims, his retaliation claim, and his
due process claim. While we agree with
the district court that the defendants
were entitled to summary judgment on the
discrimination and retaliation claims, we
conclude that further proceedings are
necessary on the due process claim, which
we therefore remand.
I

   When Lalvani, a man of Asian-Indian
descent, began working as a social worker
at CCH in 1966, the hospital was under
the authority of Cook County. In 1969,

control of the hospital was transferred to the Health and Hospitals Governing Commission (HHGC), pursuant to the County Hospitals Governing Commission Act, 1969 Ill. Laws 76-32, codified at Ill. Rev. Stat. ch. 34, para.para. 5011 et seq. Four years later, in 1973, while CCH was under HHGC control, CCH promoted Lalvani to the position of Medical Social Worker IV. Effective November 30, 1979, the HHGC was abolished by 1979 Ill. Laws 81-1197, at which time control over CCH was returned to Cook County. The latter statute contained a provision, now codified at 55 ILCS 5/5-37003, stipulating that the Cook County Board of Commissioners was to "have and exercise all rights, powers and duties heretofore exercised by the Commission [i.e., HHGC]. . . . All rights, duties, and obligations of the Commission shall become the rights, duties and obligations of the Board of Commissioners." Id. Since 1979, CCH has remained under the control of Cook County.

Between 1979 and his termination in 1996, Lalvani remained in his Social Worker IV position. In 1989, he applied for a promotion to a vacant Medical Social Worker V position, but he was unsuccessful. He believed the reason was that the selection committee had decided in advance to select an African-American for the position; this belief prompted him to file a grievance with CCH. CCH found no merit in the grievance, but Lalvani pursued it in a race discrimination complaint filed in 1989 with the Illinois Human Rights Commission (HRC). To put it mildly, the HRC took its time in processing the complaint. It was not until approximately six years later that the Commission at last scheduled a hearing on the complaint, which took place before an administrative law judge (ALJ) on May 12, 1995. The ALJ ruled in Lalvani's favor, finding that CCH's failure to promote him had been discriminatory. In the end, however, he did not prevail, as the Commission reversed the ALJ's ruling in January of 1998.

According to Lalvani's evidence, his relationship with management in the Social Work Department deteriorated markedly after he filed his complaint with the Commission. Prior to that time, he had been highly praised and had never

been disciplined. Afterwards, between late 1989 and November 1993, he endured a long string of setbacks, including increased work assignments and disparate treatment with respect to matters such as discipline, time off, access to resources, and promotions. During this period, he filed several successful grievances against his immediate supervisors. The final incident during this period occurred in November 1993, when Coleman, who was Lalvani's direct supervisor, assigned him to a non-supervisory ward duty position typically assigned to a Social Worker I. This required Lalvani to perform functions normally assigned to employees three rank levels below his. As far as the record reveals, all was then quiet until July of 1995, when Coleman filed written complaints against Lalvani alleging that he was not satisfactorily performing his duties. Lalvani challenged the charges and, rather than pursuing them, Coleman dropped the matter.

In 1996, Cook County engaged in a substantial reduction in force under which it eventually laid off 500 employees county-wide, some of whom worked at CCH. CCH department heads such as Coleman were given strict payroll budget limits to observe and were instructed to reorganize staffing as necessary to meet their departmental service requirements. Coleman decided to eliminate the only two Social Worker IV positions in his department, along with an Administrative Assistant IV position. At the same time, he chose to retain four vacant Social Worker II positions, and he created a new Assistant Director position for the Department. This reorganization did not reduce the Social Work Department's total salary expenditures, but it obviously reshuffled the content of the jobs. Asked to explain the reorganization at his deposition, Coleman said, "I went by what type of organizational structure do we need in place to best be able to meet our obligation to patient care."

After Coleman and the other department heads made their decisions, letters went out informing the unlucky employees who had been targeted to lose their jobs. On December 7, 1996, the 30-year veteran Lalvani received a letter from Barbara Penn, the CCH Director of Human

Resources, bluntly telling him that his position had been eliminated "due to a decrease in budgeted funds for certain departments." The letter went on to say that if his position was Civil Service certified he might be entitled to certain bumping and recall rights and that he should direct any questions to the Department of Human Resources. Lalvani followed that advice and sent a letter requesting clarification of his rights. Penn responded in a return letter that "[y]our position, a Medical Social Worker IV, was not covered by a collective bargaining agreement with the County or Civil Service Certified. Therefore, you do not have . . . bumping rights to the next lower grade nor recall rights. In addition there were no other employees least [sic] senior to you in your job classification that were not affected in the reduction in force."

Lalvani was sure that Coleman had manipulated the reorganization of the Department so that he could rid himself of Lalvani. His suspicions were reinforced when Marcia Saliga, the other Social Worker IV who lost her job in the reorganization, told him that Coleman approached her shortly after the layoff letters went out and apologetically explained that her position had to be eliminated because otherwise CCH could not have terminated Lalvani. Under Illinois law, had a Social Worker IV position remained, Lalvani would have been entitled to bump Saliga because he was the more senior of the Social Worker IV employees. See 55 ILCS 5/3-14024.

In the litigation that followed, Lalvani asserted three theories that are relevant to this appeal. First, he claimed that his termination in December of 1996 was discriminatory, in violation of 42 U.S.C. sec.sec. 1981 and 1983 and Title VII, 42 U.S.C. sec. 2000e et seq. Second, he asserted that he was selected for the RIF as a means of retaliating against him for his filing the discrimination complaint in 1989, in violation of Title VII, 42 U.S.C. sec. 2000e-3(a). Finally, he asserted that the County authorities violated his due process rights when they dismissed him, in violation of 42 U.S.C. sec. 1983.

II

Because the district court dismissed all of the claims at issue in this appeal on summary judgment, our review is de novo, and we take the facts and reasonable inferences in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). We affirm if the record, taken in that light, shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

A.  Ethnicity Discrimination

Lalvani's claim here is straightforward: he contends that Coleman fired him (by eliminating his Social Worker IV position) because of his Asian-Indian ethnicity. He has no direct evidence to back up this assertion, and thus, like many others, he must use the burden-shifting method first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). A prima facie case of race or ethnicity discrimination under sec. 1981 is predicated on the same elements as an ethnicity discrimination claim under Title VII, and we thus analyze these two aspects of his case together. As plaintiff, Lalvani had to produce evidence that: (1) he was a member of a protected class; (2) he was qualified for the job in question or was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated persons not in the protected class more favorably. Taylor v. Canteen Corp., 69 F.3d 773, 779 (7th Cir. 1995).

The district court found that Lalvani satisfied the first three elements of the prima facie case but failed to provide any evidence under the fourth part that similarly situated persons not in his protected class were treated more favorably. We agree. Lalvani did not identify a single CCH employee (Social Worker IV or otherwise) who was in a similar position and was not terminated during the RIF. Because he has not even attempted to make such a showing, we need not decide who actually was "similarly situated" for this purpose. The only obvious candidate in the record is Saliga, a Caucasian woman, and she was

terminated, too. The district court properly determined that all of Lalvani's arguments regarding Coleman's stated desire to get rid of him go to the question of pretext, an issue we do not reach until Lalvani has made out his prima facie case.

On appeal, Lalvani argues that he satisfied the fourth element of the prima facie case by pointing to open positions in the Social Work Department for which he was qualified but to which he was not transferred after the elimination of his position. But here he is mixing apples and oranges. The "open position" cases to which Lalvani cites involve allegations of a failure to hire, promote, or properly bump. See, e.g., Mills v. Health Care Serv. Corp., 171 F.3d 450 (7th Cir. 1999). In such cases, a plaintiff can often raise an inference of discrimination by pointing to positions left unfilled. Lalvani's complaint only alleges that "[i]n terminating Plaintiff Prem Lalvani each Defendant . . . intentionally discriminated against Plaintiff Prem Lalvani on the basis of his race, color, and national origin." Nowhere in his complaint does Lalvani allege that Cook County or Coleman discriminated against him in failing to hire him for one of the open Social Worker II positions, and he cannot amend his complaint on appeal. We acknowledge that in cases involving economically motivated RIFs we have held that plaintiffs can point to empty positions as evidence of pretext, see, e.g., Smith v. Cook County, 74 F.3d 829 (7th Cir. 1996), but in these cases the plaintiff is still required to identify similarly situated individuals who were treated more favorably. Id. at 831. Lalvani did not. The district court therefore properly granted summary judgment to the defendants on these claims.

B.  Title VII Retaliation

Lalvani also argues that even if his ethnicity was not a factor in his termination, retaliation was. Specifically, he claims that CCH (through Coleman) fired him in retaliation for his filing of the complaint with the Illinois Human Rights Commission in 1989. Again lacking any direct evidence of retaliatory intent, Lalvani is left with

the McDonnell Douglas burden-shifting method. In order to state a prima facie case of retaliation under Title VII, a plaintiff must present sufficient evidence that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected expression and the adverse action. Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998). If the plaintiff is able to make out a prima facie case, the defendant must articulate a legitimate business reason for the adverse employment action. If the defendant does so, the plaintiff must present evidence that the defendant's proffered explanation is pretextual.

The district court found that Lalvani's retaliation claim foundered on the element of causation, and we agree. Inretaliation cases, time is often an important evidentiary ally of the plaintiff. When an adverse employment action follows close on the heels of protected expression, and the plaintiff can show that the person who decided to impose the adverse action knew of the protected conduct, the causation element of the prima facie case is typically satisfied. See Sanchez v. Henderson, 188 F.3d 740, 747 n. 4 (7th Cir. 1999);-Hunt-Golliday v. Metropolitan Water Reclamation Dist., 104 F.3d 1004, 1014 (7th Cir. 1997). As the district court pointed out, however, it works the other way, too. As the time separating the protected conduct and the adverse employment action grows, the causal inference weakens and eventually time becomes the plaintiff's enemy. Lalvani's is the latter type of case.

The protected conduct that Lalvani thinks lay behind his termination in December of 1996 occurred seven yearsearlier, in 1989. By itself, this time lag casts serious doubt on his retaliation claim. Apparently recognizing this, Lalvani argues that we should measure the elapsed time not from when he filed the complaint, but from the time Coleman and other CCH managers were called to testify regarding his discrimination charge before the ALJ in May of 1995. Assuming for purposes of argument that this is the appropriate moment to start the clock running, Lalvani is still short of the mark. He was not terminated until a year and a

half after that hearing, well beyond the time that would allow a reasonable jury to conclude that his termination was causally related to the May 1995 hearing. See Filipovic v. K & R Express Sys., Inc., 176 F.3d 390 (7th Cir. 1999) (four months negates causal inference); Davidson v. Midelfort Clinic, 133 F.3d 499 (7th Cir. 1998) (no causal inference where employee was terminated five months after filing EEOC complaint, even though complaint was still pending); Paluck v. Gooding Rubber Co., 221 F.3d 1003 (7th Cir. 2000) (no causal inference after a year).

We acknowledge that temporal proximity is only evidence of causation, not a separate element of the prima facie case, and thus there will be cases in which a plaintiff can demonstrate causation despite a substantial time lag, see Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997). This, however, is not one of them. Other than pure speculation that Coleman was biding his time, awaiting an opportunity to punish Lalvani for forcing him to go before the ALJ, Lalvani offers nothing to support a causal connection between the hearing and his ultimate termination. The district court thus properly granted summary judgment on Lalvani's retaliation claim.

## C. Due Process

Lalvani last argues that he was terminated without the process to which he was entitled under the Fourteenth Amendment to the Constitution. The district court concluded that Lalvani did not have a property interest in his job, and thus that CCH could terminate him at will. Alternatively, the court found that even if Lalvani did have a property interest in his job, he received all the process he was due because he was terminated pursuant to a RIF.

In evaluating Lalvani's due process claim, we must first decide whether Lalvani had a protected property interest in his position; if so, we then turn to the question whether he received the process he was due. See Hamlin v. Vaudenberg, 95 F.3d 580, 584 (7th Cir. 1996). Not all government employees have a property interest in their jobs. A property interest exists only where the

government employee has a "legitimate claim of entitlement" to his job. McMillian v. Svetanoff, 878 F.2d 186, 191 (7th Cir. 1989). Such a claim of entitlement is typically rooted in statutory or contractual language indicating that the employee cannot be terminated but for cause. See Bishop v. Wood, 426 U.S. 341, 344 (1976).

Employees of Cook County who have Civil Service status cannot be fired except for cause and thus have a property interest in their jobs. See 55 ILCS 5/3-14023. Under the Civil Service rules that were in effect in Cook County in 1996, that status apparently did not extend to Social Worker IV employees like Lalvani. For purposes of argument we assume this to be the case because Lalvani concedes it, and it is of no further relevance to our analysis. Lalvani claims, in fact, that his status was determined earlier, while CCH was under the control of HHGC. As of the time Cook County re-assumed control over the Hospital in 1979, Lalvani claims, he had Civil Service status as an employee of HHGC. Nothing in the transfer of corporate authority from HHGC back to the County, he continues, stripped him of that protection.

Lalvani placed sufficient evidence into the record to create a disputed issue of fact as to whether or not he attained Civil Service status while CCH was under HHGC control. The statute governing HHGC provided that "[a]ll appointments and promotions to positions [except certain administrative positions] shall be made solely on the basis of merit and fitness, to be ascertained insofar as practical by competitive examination or other accepted techniques of personal [sic] administration based on merit principles." Ch. 34, para. 5026, sec. 16. Merit or career employees, in turn, could not be "discharged, demoted or suspended for a period of more than 30 days, except for cause and upon written charges," and they had to have an opportunity to be heard. Id. Attached to Lalvani's motion for partial summary judgment were several evaluation forms covering the period from 10/18/72 through 10/18/76, all of which had the "career" employee box checked off (as opposed to "temporary"). Another form, showing his promotion from Medical Social Worker III to Medical Social Worker IV indicates that he was under the

"merit" pay plan. This evidence was enough to raise at least a genuine issue of fact regarding his employment status during the HHGC years.

The next question relates to what rights went along with the attainment of "merit" or "career" status under the HHGC and whether Cook County was obligated to recognize those rights. As it happens, an earlier decision of this court has already considered that issue. In Carston v. Cook County, 962 F.2d 749 (7th Cir. 1992), a group of long-time security officers for Oak Forest Hospital brought suit alleging that they had achieved Civil Service or "career" status under the HHGC and that Cook County was required to recognize that status. We affirmed summary judgment in favor of the security officers. Carston first held that under the HHGC merit system, those who attained Civil Service or career status had a right to be discharged only for cause and thus had "a protect[ed] property interest in continued employment, which is protected by the due process clause." Id. at 752. CCH has not challenged this part of the Carston holding, and we see no reason to disturb it.

Carston then considered whether Cook County was required to recognize the Civil Service status that the security officers had attained while working for HHGC. The answer was yes. As we have already noted, part of the statute that abolished the HHGC and returned control over Oak Forest Hospital to Cook County provides in relevant part that "[a]ll rights, duties and obligations of the [HHGC] shall become the rights, duties and obligations of the [Cook County] Board of Commissioners." Ill. Rev. Stat. ch. 34, para. 5020, now codified at 55 ILCS 5/5-37003. In Carston, we concluded that among the obligations that Cook County acquired from the HHGC is the obligation to respect the Civil Service protections of HHGC career employees. Cook County advanced a number of theories against that conclusion at the time, all of which we rejected, and reject again today.

The district court was naturally aware of Carston, but it concluded that Carston did not apply to Lalvani because the deprivation suffered by the Carston

plaintiffs occurred before January 1, 1990, the date upon which the Illinois statute governing layoffs of Cook County employees became effective. With respect, we think the district court misconstrued the relation between the two laws. The layoff statute is now codified at 55 ILCS 5/3-14024. When it was passed, it did not amend Ill. Rev. Stat. ch. 34, para. 5020 (the law transferring the rights and obligations of HHGC to Cook County). To the contrary, section 5/3-14024 merely recodified an identical earlier Illinois law, Ill. Rev. Stat. ch. 34, para. 1119 (1979), which was on the books when paragraph 5020 was enacted. The transfer of authority statute, paragraph 5020, was thus enacted against the background of an existing layoff statute for Cook County employees, and the two continue to coexist to this day. The re-codification of the Cook County layoff statute had no impact on the legal significance of paragraph 5020 and did nothing to alter the applicability of the holding in Carston to Lalvani's situation.

Assuming that Lalvani can persuade a jury that he obtained career employee status while working under the HHGC, Carston resolves in Lalvani's favor the question of whether he had a protected property interest in his employment and whether Cook County could deprive him of that employment without due process. The only remaining question is whether Lalvani received all the process that would have been due in connection with his termination. This is a question of federal law, see Shango v. Jurich, 681 F.2d 1091, 1101 (7th Cir. 1982), resolved by applying the balancing test articulated in Mathews v. Eldridge, 424 U.S. 319 (1976). If he did, the County is entitled to prevail; if not, further proceedings are needed.

The flexible approach to due process adopted in Mathews requires us to weigh the significance of the private interest at issue and the risk of an erroneous deprivation of that interest under the procedures employed by the state, against the probable benefits of any additional procedural protections and the state's interest in avoiding the fiscal and administrative burdens that those additional protections would impose. Id. at 335. Lalvani had a substantial interest in his continued employment.

Brock v. Roadway Express, Inc., 481 U.S. 252, 263 (1987) (employee's interest in retaining job "substantial"), and the process he actually received was minimal at best. Without prior notice of any kind, Lalvani received a letter stating that his position was to be eliminated within the month. He was invited to inquire by letter regarding any post-termination rights he might have. He sent a letter and received a reply indicating that he had no post-termination rights other than those shared by the general public.

The district court concluded that the minimal process that Lalvani received was more than sufficient given that CCH terminated him as part of a RIF. But the mere intonation of the acronym "RIF" does not have such a sweeping constitutional effect. It is true that even public employees with a property interest in their jobs can be terminated without full-blown due process hearings if they are properly terminated during a RIF that is not implemented through individualized decisions about whom to fire. UDC Chairs Chapter, American Assoc. of University Professors v. Board of Trustees, 56 F.3d 1469, 1474 (D.C. Cir. 1995) (explaining that lay-offs are less stigmatizing because "the individual characteristics, qualifications or reputations of the [employees] are not at issue"). At the same time, however, a government employer cannot avoid its procedural obligations if it is picking specific individuals for lay-off or termination, nor can it use a RIF to conceal a for-cause dismissal and thereby deprive a career employee of the procedural protections to which he would otherwise be entitled. See Misek v. City of Chicago, 783 F.2d 98, 100 (7th Cir. 1986). The district court appears to have taken as an established fact that Coleman did not use the RIF as an opportunity to terminate Lalvani without showing cause, but that is precisely the question Lalvani was entitled to explore in an appropriate hearing.

While no reasonable jury could conclude on this record that Coleman's decision to terminate Lalvani was motivated by Lalvani's ethnicity or his having filed a discrimination complaint in 1989, there are other kinds of "cause" that are still relevant to a career employee. Here, there is substantial evidence that

Coleman was dissatisfied with Lalvani's performance as an employee. The record reveals numerous run-ins between the two after Coleman became Lalvani's supervisor in 1991. Over time, Coleman progressively reduced Lalvani's supervisory duties and assigned him tasks usually reserved for lower ranking social workers. Coleman filed disciplinary charges against Lalvani for 1) failure to follow policies and procedures; 2) delayed discharge planning; 3) poor job performance; and 4) negligence in the performance of duties. These charges were never proven, because Coleman dropped them. Lalvani has evidence that it was Coleman's (perhaps unsupported) dissatisfaction, rather than the organizational demands created by the County's belt-tightening, that led Coleman to recommend the elimination of his position. As mentioned earlier, Marcia Saliga, the other Social Worker IV who was terminated during the RIF, testified in detail to a conversation with Coleman on December 10, 1996. According to her affidavit testimony, Coleman apologized for her lay-off and "he told me that I was being 'laid off because of Lalvani', and that 'he (Mr. Lalvani) was the one that the administration was after.' Mr. Coleman also said that 'they (the administration) could not get rid of him (Mr. Lalvani) without getting rid of me, also.'" A jury may choose to disbelieve this testimony, but on summary judgment we are not entitled to do so. Based on this testimony and the uncontradicted evidence in the record that Coleman was dissatisfied with Lalvani's job performance, a reasonable jury could conclude that Coleman used the RIF as pretext for the termination of a career employee without providing Lalvani an opportunity to rebut the allegations of bad performance.

At least since Cleveland Board of Education v. Loudermill, 470 U.S. 532, 546 (1985), it has been established that in most cases a public employee with a protectible property interest in his or her job who faces for-cause termination "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." That process--particularly at the pre-termination stage--may be truncated, but it must retain its meaningfulness.

The letter Lalvani received did not meet even the minimal standards that apply when a post-termination procedure is available, see, e.g., Gilbert v. Homar, 520 U.S. 924, 929 (1997); Schacht v. Wisconsin Dept. of Corrections, 175 F.3d 497, 503 (7th Cir. 1999), much less when no such hearing is offered.

## III

For the foregoing reasons, we affirm the district court's grant of summary judgment on Lalvani's discrimination and retaliation claims, but we Remand his due process claim for further proceedings consistent with this opinion.